THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROY ARMSTRONG, Defendant-Appellant.

First District (2nd Division)   No. 1—90—1924

Opinion filed April 13, 1993.

Michael J. Pelletier and Patricia Mysza, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Donna C. Leak, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Following a jury trial, defendant Roy Armstrong was convicted of first degree murder and sentenced to 25 years in the custody of the Department of Corrections. On appeal, defendant contends that (1) he was denied effective assistance of counsel; (2) his conviction should be reduced to second degree murder; and (3) he was denied a fair trial as a result of various instances of prosecutorial misconduct.

During trial, the following evidence was presented. On May 4, 1989, at approximately 10:30 a.m., the body of James Moore was found lying in the gangway of a coach house in defendant's backyard at 6807 South Harper in Chicago. The Cook County medical examiner determined that the cause of death was a stab wound to the chest, which separated his ribs and pierced his heart and lung. A small stab wound on Moore's back was also noted, but the medical examiner was

unable to determine if that wound was caused by a knife or a sharp piece of glass.

Angelia Dunn, defendant's cousin who lived in the apartment above defendant at 6807 South Harper, was sleeping on the morning of May 4, 1989, when she was awakened at approximately 10:30 a.m. by defendant's voice coming from the backyard. She heard defendant say, "You gone [sic] quit messing with me. Quit messing with me, motherfucker. Quit it, leave me alone." Dunn looked out her bedroom window and saw defendant and Moore facing each other in the backyard. She noticed that Moore was swinging a stick approximately three feet long at defendant, but was unable to see if defendant was holding anything. Moore then fell backwards down the stairs to the coach house, and defendant walked toward the front gate.

Dunn then left her apartment and ran downstairs, where she met defendant just outside his apartment. The door was already open, and he was on his way inside. She noticed that defendant's clothes were bloody. The two went inside the apartment, where defendant changed clothes. While she was in the apartment, she noticed a bloody knife in the kitchen sink. Later that morning, defendant called her and told her that he was sorry that she had to see what happened, "[b]ut, I ke[pt] telling him to leave me alone. *** Maybe now he'll just leave me alone." Dunn informed defendant that she learned from the paramedics that Moore was dead.

At approximately 11:45 that morning, Chicago police detectives James Cassidy and Edward Schmidt arrived at the scene to investigate the death as a possible homicide. In their efforts to find witnesses to the stabbing and to acquire any information that would be helpful in the investigation, they tried to interview as many people as possible. Cassidy attempted to speak with defendant at that time, but was unable to do so because no one was home.

That afternoon, Detectives George Tracy and George Holmes took over the investigation and, at about 9 p.m., went to 6807 South Harper in order to "canvass the building to locate any witnesses." After they rang the bell, Hershey Gilbert, defendant's roommate, came down from the second-floor apartment and opened the outside door to the building. They told Gilbert why they were there and said that they would be up to speak with him in a few minutes, after they spoke to other residents in the building. After stopping at two other apartments, Tracy and Holmes arrived at defendant's door on the second floor, where they heard a conversation on the other side of the door. They knocked on the door, and Gilbert opened it and let them in. The three men stood near the front door in the hallway. When the

detectives asked if defendant was home, Gilbert said that he was not and that he had not seen him since early that morning. Tracy then noticed some movement from behind the bathroom door, and he walked over to the bathroom and looked inside, where he saw defendant standing fully clothed in an empty bathtub.

Defendant and Tracy walked to the kitchen, where Gilbert and Holmes were waiting. Tracy informed defendant that he was investigating the stabbing and defendant replied that he had heard about it. Holmes advised defendant of his *Miranda* rights and then asked for permission to look around the apartment. Defendant "readily agreed" and signed a consent to search form. Tracy and defendant then waited in the living room while Holmes searched the kitchen, where he found a bloody pair of shoes under the sink. When the detectives showed the shoes to defendant, he told them that he had a fight with Moore in the backyard and stabbed him with a stick. Defendant then took the detectives outside to show them what had happened.

In the backyard, defendant explained that Moore followed him from the alley through the back gate, picked up a rock, and threw it at him from approximately 10 feet away. Defendant told them that the rock struck him in the forehead, but no marks, scratches, or swelling was noticeable at that time. Defendant explained that he picked up a stick and stuck Moore in the ribs, breaking the stick to a point. After struggling for a few more seconds, Moore backed up and defendant "somehow" stabbed Moore with the stick. Defendant said that he then went upstairs and changed clothes.

Defendant then told the detectives that his bloody pants were in the kitchen garbage, and the three men went upstairs to retrieve them. The detectives then took defendant to the police station, where he was placed in an interview room. At 10:30 p.m., Holmes and Tracy entered the room, readvised him of his rights, and asked if he would answer a few questions. Defendant responded that he would. Defendant stated that he had known Moore for several years, but that they were merely acquaintances. Early that morning, he went to visit a friend at the New Grace Hotel at 67th and Stony Island. As he entered the building, he ran into Moore, who asked for a cigarette. When defendant said that he had none, Moore responded that he would get one from defendant's sister. Defendant explained to him, however, that he had no sister.

A few minutes later, as defendant left his friend's room, he saw Moore standing in the hallway, holding a wooden board in his hands like a baseball bat. Moore then struck defendant in the neck with his hand. As defendant left the hotel, Moore screamed that he would

crack the board over defendant's head. Defendant then went home, had a snack, and put some beer, liquor, and a pipe in a bag and returned to the New Grace Hotel in order to learn why Moore was angry. After dropping off the beer and liquor with a friend at the hotel, defendant began walking toward 69th and Stony Island with the pipe, but then threw it into an abandoned building. At 69th and Stony Island, defendant encountered his friend Butch, and the two men went into a liquor store on the corner. As they were leaving the store, Moore approached defendant and asked if he was looking for him. Defendant responded that he was and then struck Moore in the face, forcing him to the ground. While Moore was on the ground, defendant kicked him in the ribs. Defendant then walked through the alley to his backyard. Moore followed him into the backyard, where they began fighting. Defendant then stabbed Moore with a stick.

Tracy and Holmes then left the interview room and spoke with defendant's mother, his cousin Angelia Dunn, and his cousin's boyfriend. The detectives then resumed their questioning of defendant, asking him if he stabbed Moore with a knife. Defendant replied that he stabbed Moore with a brown-handled kitchen knife, with a three- to four-inch blade. Defendant then told them that he had been carrying the knife for protection for two to three weeks. He explained that after the stabbing, he placed the knife in the kitchen sink.

At 3 a.m., an assistant State's Attorney arrived at the police station, advised defendant of his rights, and began questioning him. At the end of the questioning, defendant agreed to sign a written statement prepared by her. At 4:45 a.m., defendant signed the written statement, which was essentially a repetition of the earlier statements made by him. Defendant also stated that after Moore threw the rock at him, he picked up a stick and hit Moore on the side with it, causing it to break in half. Moore then picked up the stick, and defendant pulled out a knife that he carried for protection. When Moore approached defendant with the stick, a struggle ensued, and defendant stabbed him.

The next morning at 9:30 a.m., Detectives Cassidy and Schmidt again interviewed defendant. Defendant repeated his earlier statements and explained that when they were in front of the liquor store, Moore had placed his hand in his pocket and told him that he was a dead man. Defendant thought Moore had a gun in his pocket. Defendant then went home, went upstairs to his apartment, and looked out his kitchen window and saw Moore standing in the backyard with a stick and a piece of concrete. Defendant, "tired of [Moore] fucking with [him]," took a knife from the kitchen drawer and went to the

backyard. As he approached Moore, he asked: "Who is the dead man now?" Moore then threw the concrete at defendant, grazing his head. Brandishing the knife, defendant approached Moore, who was swinging a stick. Moore backed up to the stairwell and dropped the stick. A struggle ensued and defendant stabbed Moore once in the stomach. Moore then collapsed. Defendant then went upstairs and changed his clothes. On his way to his apartment, he ran into his cousin Angelia Dunn, who thought he was hurt. Defendant told her that he was "tired of [Moore] fucking with [him]."

After the interrogation, defendant signed another consent to search form and Cassidy and Schmidt went to his apartment in order to find the knife, the stick, and the concrete. The detectives found two knives in the kitchen sink, a stick next to the stairwell by the coach house, and a piece of concrete about 10 to 15 feet away in the middle of the backyard. They brought the objects back to the station, where they showed them to defendant, who identified the stick and the concrete as those used by Moore, but stated that neither knife was the one he used to stab Moore.

Later that afternoon, at 2:45 p.m., defendant stated that he wanted to make another statement because he was not entirely truthful when he spoke to the assistant State's Attorney. Another assistant State's Attorney then took defendant's statement in the presence of a court reporter. In that statement, he repeated his earlier statement and said that he armed himself with the knife only after he saw Moore in the backyard.

During defendant's case in chief, Earl Parker testified that he lived with Angelia Dunn, and that on the morning of May 4, 1989, he did not hear anyone come up the stairs until defendant came up after the stabbing. Lionel Dunn, defendant's uncle, testified that when he left his apartment in the coach house that morning before the stabbing, there were no sticks lying near the stairwell.

"Butch" Albert Johnson testified that when he and defendant left the liquor store at 69th and Stony Island, Moore approached defendant. Defendant knocked Moore to the ground and then pulled out a knife because he thought Moore had something in his pocket. Before that, Johnson had not known that defendant was carrying a knife.

Officer Joseph Adams of the Chicago police department testified that he had two violent encounters with Moore. The first occurred on September 18, 1985, at 3:30 a.m., when he attempted to arrest Moore, but Moore struggled and tried to get his partner's gun from its holster. About 10 officers were called to the scene, six of whom were necessary to subdue Moore. The second incident occurred on

April 10, 1986, at approximately 9 p.m., when Adams saw Moore attempting to break into a store. Moore attempted to flee, but when he was cornered about one block away, he began to fight. Adams called for assistance, and he eventually subdued Moore with the help of seven other officers.

Defendant then testified in his own behalf, repeating the account that he told during the investigation. He stated that he had the knife with him at the liquor store; he did not bring it down from the kitchen just before his final encounter with Moore. He explained that he originally told the police that he stabbed Moore with a stick because he was nervous. He stabbed Moore because he believed he was going to kill him and thought he had no other options.

After the defense rested, the circuit court instructed the jury concerning first degree murder; second degree murder predicated upon an unreasonable belief in the necessity of self-defense, over defendant's objection; and involuntary manslaughter, over the State's objection. As previously noted, the jury found defendant guilty of first degree murder, and the court sentenced him to 25 years in prison. This appeal followed.

I

Defendant first contends that his trial counsel was ineffective in failing to assert the strongest grounds available to support a motion to suppress his statements and other evidence. Prior to trial, defense counsel moved to suppress defendant's statements on the ground that they were "obtained as a result of psychological and mental coercion." At the hearing on the motion, the State presented much evidence that defendant's statements were made voluntarily. Defense counsel, however, presented no evidence in support of the motion. Following arguments, the circuit court denied the motion, noting that it had never seen a motion with less merit. On appeal, defendant maintains that his statements and the evidence seized in his apartment were vulnerable to attack on the grounds that they were the fruits of an illegal search and seizure that occurred when the police entered his apartment and arrested him.

In order to establish a claim of ineffective assistance of counsel, defendant must first establish that his counsel was constitutionally deficient; that the "errors [were] so serious that counsel was not functioning as the 'counsel' guaranteed *** by the Sixth Amendment." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Our inquiry is simply " 'whether counsel's assistance was reasonable considering all the circum-

stances.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061, quoting *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Defendant must also establish that "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Because defendant has failed to satisfy his burden under the *Strickland* test, his contention that he was denied effective assistance of counsel must be rejected.

Defendant asserts that Tracy conducted an illegal search of his home when he walked down the hallway and proceeded to look in the bathroom without consent. Defendant also maintains that he was illegally seized when Tracy found him standing in the bathtub and escorted him to the kitchen. Initially, we note that it is undisputed that the detectives lawfully entered the apartment upon being admitted by defendant's roommate, Hershey Gilbert. (See *Illinois v. Rodriguez* (1990), 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (holding that no illegal entry occurs when police rely upon the consent of someone with at least apparent authority).) While the law is well settled that consent to enter does not constitute consent to search (see *People v. Annerino* (1981), 97 Ill. App. 3d 240, 422 N.E.2d 923 (holding that consent to enter the defendant's kitchen to investigate a crime did not authorize a search of the defendant's crawl space); *People v. Rodgers* (1981), 96 Ill. App. 3d 416, 421 N.E.2d 203 (defendant's consent to police entry did not authorize an exhaustive search of his home)), evidence need not be suppressed in every case where the defendant asserts that the police exceeded the authority granted them by the consensual entry. Instead, a defendant must prove that the police exceeded their authority and that an illegal search occurred. See Ill. Rev. Stat. 1989, ch. 38, par. 114—12(b); *People v. Olson* (1990), 198 Ill. App. 3d 675, 680-81, 556 N.E.2d 273, 276.

■ Upon reviewing the testimony at both the suppression hearing and at trial (see *People v. Walton* (1991), 221 Ill. App. 3d 782, 786, 583 N.E.2d 28, 32, *appeal denied* (1992), 143 Ill. 2d 647, 587 N.E.2d 1023 (noting that trial evidence may be considered when determining the propriety of a suppression ruling)), we find nothing that indicates the detectives' authority was limited in any manner or anything that discloses the distance between the foyer and the bathroom. In the absence of such evidence, we cannot state that Tracy exceeded the scope of his authority.

Furthermore, we do not agree with defendant that an illegal seizure occurred when Tracy found him in the bathroom, escorted him to the kitchen, and then waited with him in the living room while Holmes, pursuant to a consent to search, searched the kitchen. As this court has stated:

"[A] seizure occurs *** when a reasonable person, innocent of any crime and in view of all the circumstances surrounding the incident, would believe that he was under arrest or not free to leave. [Citations.] In the absence of a threatening presence of officers, display of a weapon, a physical touching, or use of language or tone of voice which indicates compliance with the officer's request might be compelled, a seizure has not taken place." *People v. Collins* (1989), 182 Ill. App. 3d 362, 364-65, 538 N.E.2d 781, 783, *appeal denied* (1989), 127 Ill. 2d 624, 545 N.E.2d 117.

In the instant case, after being discovered in the bathroom, defendant "stepped out" of the tub and walked with Tracy to the kitchen. The detective told defendant that he was investigating the stabbing and defendant stated that he had heard about it. No weapons were drawn, defendant was not handcuffed at any time, and he was not even touched by the police. Although the record does not indicate the precise language used by the detectives or their tone of voice, it does demonstrate that defendant was "calm and collected" and that he "readily agreed" to their requests. Although we recognize that defendant was advised of his *Miranda* rights, a common indicia of arrest, that fact alone does not establish that a person is entitled to a reasonable belief that he was not free to leave. See *People v. Neal* (1985), 111 Ill. 2d 180, 193-94, 489 N.E.2d 845, 850, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292; *Collins*, 182 Ill. App. 3d at 365, 538 N.E.2d at 783 (holding that the defendant was not under arrest even though "he was fingerprinted, photographed, and read his *Miranda* rights").

In light of the totality of the circumstances, we conclude that a reasonable man would not have thought he was under arrest. Any attempt to suppress the evidence would therefore have been a fruitless exercise, as defendant had not been illegally seized. Defendant's trial counsel was thus not constitutionally deficient for failing to assert that the evidence was the fruit of an illegal search and seizure.

■ Defendant also contends that his counsel was ineffective for proceeding on a theory of self-defense rather than second degree murder. Defendant asserts that his attorney precluded a verdict of second degree murder rather than first degree by arguing to the jury that it

should disregard the second degree murder instruction because defendant was justified in his actions. In support of his contention, defendant cites cases where the reviewing court reversed a conviction because the defendant's trial counsel was ineffective in failing to tender instructions regarding a lesser offense. (*United States ex. rel. Barnard v. Lane* (7th Cir. 1987), 819 F.2d 798; *People v. Bell* (1987), 152 Ill. App. 3d 1007, 1015, 505 N.E.2d 365, 371.) The rationale underlying those cases is that without the instruction, the jury was denied the opportunity of finding the defendant guilty of the lesser offense. (See *Lane*, 819 F.2d at 805.) Defendant's reliance on those cases is misplaced, however, because in the case at bar, such an instruction was given to the jury. Accordingly, the jury was not denied the option of second degree murder.

Furthermore, we do not agree with defendant that his counsel's remarks demonstrate that he was pursuing an "all-or-nothing" approach. Instead, the record makes it clear that the remarks were made to explain why defendant's actions were justified. As such, the remarks were simply a matter of trial strategy and therefore beyond the scope of our review. (See *People v. Fernandez* (1987), 162 Ill. App. 3d 981, 987, 516 N.E.2d 366, 370, *appeal denied* (1988), 119 Ill. 2d 563, 522 N.E.2d 1249 (holding that a reviewing court will not question areas of professional judgment when determining if counsel was constitutionally deficient).) We conclude that defendant's attorney's performance was reasonable and that therefore defendant was not denied the effective assistance of counsel.

## II

Defendant next contends that his conviction should be reduced to second degree murder because the evidence at trial established that he unreasonably believed that deadly force was justified. The State responds that the jury's verdict was properly based on the evidence and therefore should not be overturned.

A person commits second degree murder when "[a]t the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing ***, but his belief is unreasonable." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2).) Before a defendant can be found guilty of second degree murder, he must prove the mitigating factor by a preponderance of the evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c).) "The issue of self-defense is a question of fact to be decided by the jury, and its decision should not be overturned unless the evidence is so unreasonable, improbable, or

unsatisfactory as to raise a reasonable doubt as to defendant's guilt." *People v. Ellis* (1982), 107 Ill. App. 3d 603, 610, 437 N.E.2d 409, 415.

Defendant relies on *Ellis* and *People v. Collins* (1991), 213 Ill. App. 3d 818, 572 N.E.2d 1005, *appeal denied* (1991), 141 Ill. 2d 548, 580 N.E.2d 122, for the proposition that a first degree murder conviction is inappropriate when the defendant unreasonably believed that the use of deadly force was justified. In *Ellis*, the defendant shot the victim during a struggle which ensued after the victim lunged at him. The appellate court reduced his conviction from murder to voluntary manslaughter because the evidence showed that the defendant intended to fire only a warning shot and that he called for help immediately. (*Ellis*, 107 Ill. App. 3d at 611-12, 437 N.E.2d at 414, 416-17.) Similarly, in *Collins*, the defendant shot the victim, his longtime roommate, while they were wrestling. The court reduced the defendant's first degree murder conviction because the evidence corroborated his testimony that the struggle occurred during an argument, that he initially fired the gun toward the ceiling, and that he called for help right away. *Collins*, 213 Ill. App. 3d at 825-27, 572 N.E.2d at 1010.

Despite defendant's contentions to the contrary, we are unable to find sufficient evidence in this record that casts doubt on the jury's verdict. Unlike the defendants in *Ellis* and *Collins*, defendant here made no attempt to obtain medical help for Moore, but instead attempted to hide from the authorities when they came to investigate the incident. Moreover, defendant stated to his cousin that "[m]aybe now he'll just leave me alone." Finally, defendant gave varying descriptions of the events leading up to the killing, including twice telling the police that he obtained the knife only after observing Moore standing in the backyard.

After considering all the evidence, the jury determined that defendant did not have the subjective belief that deadly force was necessary. "A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." (*People v. Petty* (1987), 160 Ill. App. 3d 207, 210-11, 513 N.E.2d 486, 488, *appeal denied* (1988), 118 Ill. 2d 549, 520 N.E.2d 390.) Because defendant's argument is contingent upon assessing the credibility of the witnesses, a role uniquely within the province of the trier of fact, we cannot conclude that the jury's verdict was "unreasonable, improbable, or unsatisfactory."

Similarly, we do not agree with defendant that the evidence demonstrates that he was "acting under a sudden and intense passion" when he stabbed Moore in the chest. Defendant asserts that he was impassioned as a result of his "mutual combat" with Moore. Mutual

combat has been defined as "a fight or struggle which both parties enter willingly or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms and death results from the combat." (*People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270, 274.) Here, the record demonstrates that defendant, armed with a knife, confronted Moore, who, according to defendant, was armed with a stick and a rock. Defendant's conviction for first degree murder was adequately supported by the evidence.

## III

Defendant's last contention is that he was denied a fair trial as a result of various instances of prosecutorial misconduct. Defendant first asserts that the State improperly implied that he had a duty to retreat from the confrontation when it cross-examined him regarding his attempt to escape. (See *People v. Estes* (1984), 127 Ill. App. 3d 642, 649, 469 N.E.2d 275, 281 (holding that a nonaggressor is not required to retreat from a place where he has a right to be).) While we agree that defendant had no duty to retreat from his own backyard, we believe that the State's questions were a proper response to defendant's testimony that he initially attempted to run away from Moore, but did not have sufficient time to unlock the back door to his building. See *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 440, 483 N.E.2d 363, 377 (holding that the State may ask the defendant "ordinarily improper" questions when they are provoked by his direct testimony on the same matter).

Defendant also contends that several statements in the State's closing argument were improper and denied him his right to a fair trial. He asserts that the prosecutor misstated the facts during his closing argument when he stated that Moore was stabbed twice, once in the chest and once in the back. Defendant points out that the medical examiner was unable to determine precisely the cause of the wound on Moore's back, but that it may have been caused by either a knife or by a sharp piece of glass. Although a prosecutor is afforded wide latitude when arguing to the jury, the comments must be based on the evidence or reasonable inferences therefrom. (*People v. Malone* (1991), 211 Ill. App. 3d 628, 636, 570 N.E.2d 584, 590, *appeal denied* (1991), 142 Ill. 2d 660, 584 N.E.2d 135.) Because the prosecutor's statement in the instant case was a reasonable inference from the medical examiner's testimony, no error occurred.

Defendant also takes issue with the prosecutor's graphic description of the method of separating the body for an internal examination during an autopsy. The prosecutor stated that the medical examiner

must "pull the rib cage apart with an electric saw," because it cannot be done by hand. Defendant objected because the medical examiner never testified that an electric saw was necessary. The circuit court sustained the objection. The State contends that the statement was a reasonable inference from the testimony, because the medical examiner "had to use some instrument to cut open the victim's body."

An improper remark in the State's closing argument will normally not require a reversal on appeal unless its prejudicial effect was such that, but for the comment, the jury would have reached a contrary verdict. (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 483 N.E.2d 340, *appeal denied* (1985), 111 Ill. 2d 563, 485 N.E.2d 1092.) Although the statement here was improper, any prejudice which resulted from the remark was vitiated when the circuit court sustained defendant's objection. See *People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 550 N.E.2d 1011, *appeal denied* (1990), 132 Ill. 2d 551, 555 N.E.2d 382.

Finally, defendant maintains that the prosecutor misstated the evidence when he argued that defendant never said before trial that he was carrying the knife during the entire incident. Although we agree with defendant that the remark was a misstatement of the evidence, any challenge to its propriety was waived for purposes of appeal when defendant failed to make a timely objection to it at trial. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Furthermore, defendant fares no better under plain error analysis; the jury would not have reached a contrary verdict if not for the misstatement. Accordingly, we reject defendant's contention that he is entitled to a new trial due to prosecutorial misconduct.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.