2021 IL App (1st) 180066-U

Order filed April 26, 2021
Dissent modified on denial of rehearing July 6, 2021

FIRST DIVISION

No. 1-18-0066

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 14 CR 4843 |
| | ) ) | |
| | ) | |
| TYREE BRANNON, | ) ) | Honorable Thaddeus Wilson, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
JUSTICE COGHLAN concurred in the judgment.
JUSTICE HYMAN dissented.

## ORDER

¶ 1    *Held*:   Trial counsel was not ineffective.  Defendant received a *de facto* life sentence, but there was no constitutional violation where the trial court carefully considered the necessary factors before imposing sentence.

¶ 2    Following a jury trial, defendant Tyree Bannon was found guilty of first-degree murder for shooting and killing Deonte Womack (720 ILCS 5/9-1(a) (West 2012)) and attempt first-degree murder (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1 (West 2012)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) for shooting and injuring Kevon

Carmichael Herring and was sentenced to 50 years' imprisonment. On appeal, he argues: 1) trial counsel was ineffective for not requesting a *Lynch* Instruction, for not arguing second degree murder, and for conceding that the facts of the case did not support a finding of second degree murder; and 2) the trial court erred in sentencing 17-year-old Tyree Brannon to a 50-year prison term, where the court imposed a *de facto* life sentence under *People v. Buffer* without adequately considering his youth and attendant characteristics, in violation of the federal and state constitutions. For the following reasons, we affirm the judgment and sentence of the trial court.

¶ 3                                    BACKGROUND

¶ 4      At trial, Jocelyn Taylor testified that she was the mother of Deonte Womack and she had last seen him on the morning of December 10, 2013, at 7:00 a.m. Deonte was twenty-one years old. She learned that Deonte had been taken to the hospital because he had been shot. Deonte died at 2:53 p.m. on December 10, 2013.

¶ 5      Kevon Carmichael-Herring testified that on January 26, 2014, he spoke to Detective Kienzle and Assistant State's Attorney (ASA) Suzi Collins at Area Central about the shooting on December 10, 2013, and gave a videotaped statement. Kevon largely repudiated the statement he provided to Detective Kienzle and ASA Collins, and he refused to identify defendant as the person that shot him and Deonte Womack. His prior videotaped statement to Assistant State's Attorney Collins describing the shooting and identifying defendant as the shooter was admitted as substantive evidence at trial.

¶ 6      Kenya Carmichael testified that she was the mother of Kevon Carmichael-Herring and Kier Carmichael-Smith. She, along with several other friends and family members, visited

Kevon at Northwestern Hospital on December 10, 2013, and during her visit, Kevon said that defendant shot him.

¶ 7     ASA Collins testified that on January 26, 2014, she was assigned to the felony review unit when she received an assignment to go to Area Central. There, she spoke to Detective Kienzle and Kevon Carmichael-Herring. Kevon agreed to speak with her about the incident from December 10, 2013, and agreed to give a videotaped statement.  In his videotaped statement that was published to the jury, Kevon said that on December 10, 2013, he was at his mother's house at 67th Street and Paxton Avenue.  Deonte Womack, whom he had known since he was five years old, met up with Kevon at Kevon's mother's house between 10:00 and 10:30 a.m. Deonte had brought guns with him and they left Kevon's mother's house with the guns to go to the store to get snacks.  Deonte had insisted that they take the guns with them. Kevon took a silver .357 Magnum handgun, and Deonte took a black .45 caliber handgun. They put the guns in their waistbands.

¶ 8     Kevon and Deonte left the house between 11 and 11:20 a.m.  They first went to a store at 71st Street and Clyde Avenue. They bought some snacks and then went eastbound on 71st Street toward Paxton Avenue. Deonte then wanted to go into a different store at 71st Street and Paxton Avenue, so they both went into the store.  While inside the store, Kevon saw Darrion Holmes, also known as "Diesel," come into the store with two other males. Kevon waited by the door while Deonte went to the back of the store and then came back to the front of the store. Kevon thought that the two males that had come into the store with Diesel were acting suspicious, so he went outside the store to see what was going on.  When he exited the store, he saw defendant walking toward the store with another male. Kevon had known defendant for about four years

and saw him almost every day. Kevon knew defendant by his nickname, "Eastwood." Kevon's younger brother, Kier Carmichael-Smith, was also outside the store.

¶ 9    Deonte then came out of the store, and Deonte and defendant started talking to one another. Defendant was telling Deonte that he wanted Deonte to give him something, but Deonte refused and repeatedly told him "no." Kevon and Deonte then walked down Paxton with Kier. Defendant followed them with several other males, including Alfontish Cockorham and Darrion Holmes. The group walked until they got near the CHA housing at 7034 South Paxton Avenue where they stopped. Deonte and defendant continued to argue. Defendant then demanded that Deonte give him something and told Deonte that he owed him something. Defendant then pulled a 9-millimeter handgun out of his pocket and started firing. He shot Deonte twice as Deonte was walking away from defendant. Deonte was about a foot away from defendant when defendant shot him. Defendant shot Deonte in the back and in the back of the head. Kevon reached for his gun in his waistband and defendant shot Kevon in the right hand. Defendant then shot Kevon two more times in the right leg and the shoulder as Kevon tried to run away. There was nobody else shooting at that time. At no point did either Kevon or Deonte pull out their guns before they got shot.

¶ 10    Kevon then saw that defendant's gun was stuck in the cocked-back position and saw defendant run off. Kevon had fallen to the ground, and while he was on the ground, he took out his gun from his waistband and threw it. He told his brother, Kier, to take the gun and give it to Quell's father, who lived in the CHA building. Kier took the gun and gave it to one of the residents at the CHA housing.

¶ 11    An ambulance came and took Kevon to Northwestern Hospital where he was treated for his injuries, which required surgery for a shattered femur.  He later told his mother, his brothers, and a few of his friends that came to visit him in the hospital that defendant was the person that shot him.

¶ 12    Detective Daniel Kienzle testified that he was assigned to investigate this case on December 10, 2013, and after arriving on scene at 71st Street and Paxton Avenue, he learned that Deonte and Kevon had been transported to Northwestern Hospital and that Deonte had died as a result of his injuries.

¶ 13     Detective Kienzle met with Kevon and his mother at Area Central on January 26, 2014. Detective Kienzle and A.S.A. Collins spoke with Kevon at around 7:00 p.m. on January 26, 2014, and Kevon then agreed to have his statement videotaped.

¶ 14    Donald Smith, an eyewitness who was living at 7026 South Paxton at the time, testified that he was at home watching television at around noon on December 10, 2013, when he heard five gunshots. Donald then went to his back porch and saw two men running down the alley and then stop in a parking lot. Donald heard one of the men say to the other, "put it over there." Donald then saw one of the men take a gun from his waistband and put it in the snow. Donald then saw the two men walk toward the next street over, Merrill Avenue. Donald spoke to police and showed them where he saw the two men hide the gun.

¶ 15    James Allen, another eyewitness who was living on Paxton Avenue between 70th Street and 71st Street, testified that he was at home around noon on December 10, 2013, watching television in his bedroom when he heard about five gunshots. James ran to his front window and looked out and saw the victims laying on the ground. On his way out to help the two victims,

James saw a police officer and flagged her down. James pointed out to the police officer where the two victims had been shot and then went back to his home. On his way up the stairs, he saw a young man wearing a grey hoodie throw an object into a salt bucket. James then looked into the salt bucket and saw a gun, which he then threw under a dumpster behind his home. After speaking with police, James pointed out where he had thrown the gun under the dumpster.

¶ 16    Dr. Marta Helenowski, an assistant medical examiner at the office of the Cook County Medical Examiner, testified that she was assigned to perform an autopsy on Deonte Womack on December 11, 2013. Dr. Helenowski observed that Deonte had a gunshot wound to the head, with an entrance wound to the back of the head, slightly to the right of the midline in the back, and an exit wound just above the entrance wound in the back of the head toward the right. She did not see any evidence of close-range firing. Although the bullet did not penetrate the skull, it did cause a fracture in the skull. There was some hemorrhage in the cranial cavity due to the impact of the gunshot wound to the head. She also observed a gunshot entrance wound to Deonte's back. She did not see any evidence of close-range firing. The wound path was from the upper back through the neck and exiting on the right side of the chin or neck area. Dr. Helenowski determined that the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

¶ 17    Chicago Police Officer Robert Zielinski testified that he and Officer Peter Ujda responded to call of shots fired at 7034 South Paxton Avenue at approximately 12:22 p.m. on December 10, 2013. When Officer Zielinski arrived, he saw Deonte Womack laying on the sidewalk, and Kevon Carmichael-Herring lying next to the curb in the street. Paramedics were treating the two victims. The paramedics that were treating Deonte called Officer Zalinski

over and pointed out a handgun that was in Deonte's waistband. Officer Zalinski removed the handgun and saw that it was a Hi-Point .45 caliber semiautomatic handgun loaded with four live rounds.

¶ 18    Evidence Technician Angelo Marconi of the Chicago Police Department testified that he and his partner, Michael Mazurski, arrived at 7032 South Paxton Avenue to process the scene and recover evidence. Marconi recovered two 9-millimeter shell casings on the sidewalk near 7032 South Paxton that were inventoried.  Marconi also recovered a Ruger .357 revolver that James Allen had thrown under the dumpster. The .357 revolver was fully loaded with six live rounds. Marconi then recovered the Ruger .9-millimeter semiautomatic handgun that Donald Smith had seen the two men hide in the snow. The .9-millimeter handgun was in an open slide lock position and had no live rounds in it.  The .9-millimeter handgun was inventoried.

¶ 19    There was a stipulation that if called to testify, Gregory Hickory would testify that he was a forensic scientist specializing in firearms identification and analysis at the Illinois State Police Crime Lab. He would further testify that the two .9-millimeter shell casings that were inventoried were fired from the 9-millimeter handgun that was recovered.

¶ 20    Detective William Levigne testified that on February 13, 2014, he was assigned to locate and arrest defendant.  He went to the location of 8101 South Ada Street along with several partners and they were allowed into the house by an older woman. Defendant was found underneath a bed on the upstairs level and was placed under arrest and taken to Area Central.

¶ 21    Sergeant Sean Ryan, a detective on December 10, 2013, testified that he arrived at 7034 South Paxton after Kevon Carmichael- Herring and Deonte Womack were taken to the hospital to look for surveillance video that may have recorded the events that took place before, during,

and after the shooting. Sergeant Ryan recovered Chicago Police Department POD video surveillance from the location of 7100 South Paxton Avenue, video surveillance from the townhomes at 7034 and 7040 South Paxton Avenue, as well as video surveillance from 7060 South Paxton Avenue, and video surveillance from 7024 to 7032 South Paxton Avenue and 7031 South Merrill Avenue.

¶ 22    Sergeant Ryan, along with Detective Russell Marillo, presented Kevon Carmichael-Herring with a photo array on January 26, 2014. Kevon looked at a photo array and identified defendant in the photo array as the person that shot Kevon and Deonte Womack.  The State rested.

¶ 23    Defendant testified that he was seventeen years old in December of 2013. He had known Deonte Womack for about five to six years and Kevon Carmichael-Herring for about seven to eight years. On December 9, 2013, defendant was with Deonte Womack, Dontrell Trotter, and Devonte Boldin near 71st Street and Clyde Avenue. At that time, Deonte was arguing with Dontrell about a weed exchange because Deonte felt he had been shorted.  Defendant tried to mediate the situation and Deonte got aggressive and loud with defendant. When defendant told Deonte, he did not have anything to do with it, Deonte pulled out a gun and pointed it at defendant. Defendant then took off running toward the next block. Defendant called Deonte about thirty to forty-five seconds later and asked Deonte why he pulled a gun on him, and Deonte told him "it's cracking," which defendant understood to mean that Deonte was going to shoot to kill.

¶ 24    After speaking with Deonte, defendant was worried and he called Kevon, who was Deonte's best friend. Defendant agreed to meet on Paxton Avenue the following day to talk the situation out with Deonte and Kevon.

¶ 25    On December 10, 2013, defendant was walking down Paxton Avenue with Arion Holmes, Alfontish Cockerham, Deonte Womack, Kevon Carmichael- Herring, and Kier Carmichael-Smith.   Defendant had a gun in his pocket.  When he initially saw Deonte and Kevon at 70th Street and Paxton Avenue, he did not see a gun in either of their waistbands. As they walked, defendant and Deonte talked about the incident that had happened the day before, where Deonte had pulled a gun on defendant. Defendant testified that Deonte was being aggressive and loud as they spoke.  Defendant asked Deonte why he would pull a gun on him. Deonte responded that "it was cracking," which defendant understood to mean that Deonte was going to shoot or kill him. Defendant felt scared.  When Deonte reached for his waistband, defendant shot Deonte in the back. Deonte was about a foot or two away when defendant shot him.  Once Deonte was on the ground, defendant shot him again in the head.  Defendant testified that he never saw Deonte's gun but claimed that he feared for his life as he was certain that Deonte was going to shoot him.

¶ 26    After defendant shot Deonte, he saw Kevon reaching for his waistband, so he shot Kevon three times.  Defendant was certain that Kevon was going to shoot and kill him. Kevon was about a foot or two away when defendant started shooting him. Defendant fired all the bullets he had in the gun, first shooting Kevon in the right hand.  After Kevon no longer had a gun in his hand, defendant continued to shoot at him. Defendant also shot Kevon in the back of the leg as Kevon was running away from defendant.

¶ 27    After the shooting, defendant did not wait for police to arrive.  He ran away with his gun and buried it in a snowbank. He then fled to Minnesota.  He was later arrested.  After his mother arrived at the police station, defendant spoke with police and initially lied to them about what happened. He initially told police that he was at home with his sister, Latifa Brannon, on December 10, 2013. He did not tell police what happened on December 9, 2013.  He later told police that on December 9, 2013, Deonte pulled a gun on him after his friend tried to rob Deonte. He then told police that he called Deonte later December 9, 2013, and the conflict was over then. The defense rested.

¶ 28    The jury returned verdicts of guilty of first- degree murder, guilty of attempt first-degree murder, and guilty of aggravated battery with a firearm.  After considering the arguments in aggravation and mitigation, the court sentenced defendant to 50 years for first-degree murder and a consecutive 15-year term for attempt first-degree murder.  The court specifically declined to impose any sentence enhancements with respect to those counts.

¶ 29    Defense counsel filed a motion to reconsider sentence. After hearing arguments on the motion, the trial court reduced the 50-year sentence it had initially imposed for first-degree murder to 35 years.  The court did not change the 15-year sentence it initially imposed for the attempt first-degree murder. Defendant appealed.

¶ 30                                ANALYSIS

¶ 31    Defendant first argues that defense counsel was ineffective when he failed to request the use of Illinois Pattern Instruction Criminal 3.12X after successfully seeking admission, under *Lynch*, of the victim's prior act of violence toward defendant.  Specifically, defendant argues that

"[c]ounsel's failure to request IPI 3.12X prejudiced [defendant] because the jury was not provided with the information it needed to fully and properly consider [defendant's] defense."

¶ 32    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans,* 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id.* Failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 33    Defendant argues that, although the trial court admitted defendant's *Lynch* evidence demonstrating the victims' prior violent acts, defense counsel failed to request an instruction on how to weigh that evidence and therefore "lacked the necessary tools to analyze the evidence fully and to reach a verdict based on those facts."  Specifically, defendant claims that the jury should have been given IPI Criminal 4th No. 3.12X, which instructs the jury on *Lynch* evidence. IPI Criminal 4th No. 3.12X provides:

> "In this case the State must prove beyond a reasonable doubt the proposition that defendant was not justified in using the force which he used. You have [ (heard testimony) (received evidence) ] of _____'s [ (prior conviction of a violent crime) (prior acts of violence) (reputation for violence) ]. It is for you to determine whether ___ [ (was convicted) (committed those acts) (had this reputation) ]. If you determine that _____ [ (was convicted) (committed those acts) (had this reputation) ] you may consider that

11

evidence in deciding whether the State has proved beyond a reasonable doubt that the

defendant was not justified in using the force which he used."

¶ 34    After a review of the instructions given to the jury, we find defendant suffered no

prejudice as a result of counsel's failure to request IPI Criminal 4th No. 3.12X.  When reviewing

the adequacy of jury instructions, a court must consider all of the instructions as a unit to

determine whether they fully and fairly covered the law. *People v. Cooper*, 2013 IL App (1st)

113030, ¶ 110. The other instructions given to the jury allowed them to properly consider the

evidence of Deonte Womack pointing a gun at defendant on December 9, 2013.  The court

instructed the jury that "A person is justified in the use of force when and to the extent that he

reasonably believes that such conduct is necessary to defend himself against the imminent use of

unlawful force."  The court further instructed the jury that "a person is justified in the use of

force which is intended or likely to cause death or great bodily harm only if he reasonably

believes that such force is necessary to prevent imminent death or great bodily harm to himself."

The trial court also instructed the jury, "The evidence which you should consider consists only of

the testimony of the witnesses, stipulations, and the exhibits to which the Court has received.

You should consider all the evidence in the light of your own observations and experience in

life."  Having these instructions, the jury was instructed that they could consider the evidence

that Deonte Womack pointed a gun at defendant on December 9, 2013, to determine whether

defendant reasonably believed it was necessary to shoot Deonte Womack on December 10, 2013.

There was no limiting instruction related to the December 9 incident so the jury was instructed to

consider that evidence as it would consider all other evidence in reaching its verdict. The jury

could accept or reject that evidence, along with all the other evidence, and it could give that

evidence whatever weight it deemed appropriate. Thus, even absent IPI 3.12X, if the jury credited the December 9 evidence it would necessarily have factored into its determination of whether the State proved its case beyond a reasonable doubt. Therefore, IPI 3.12X was not "so critical to the defense" that counsel's failure to request it denied defendant a fair trial. Defendant suffered no prejudice as a result. *People v. Falco*, 2014 Il App (1st) 11197, ¶ 16, and our confidence in the jury's verdict is not undermined.

¶ 35 Defendant next claims that counsel was ineffective when he requested an instruction on second degree murder but did not argue the alternative defense of second-degree murder to the jury. Although counsel did request an instruction on second-degree murder, he argues that his attorney's closing argument was inconsistent with the defense-requested instruction of second-degree murder.

¶ 36 Defendant's argument fails because defendant's defense was that he was acting reasonably in self-defense and was not guilty. It would be inconsistent for defense counsel to argue that defendant had both a reasonable belief in the need for self-defense (not guilty) and he had an unreasonable belief in the need for self-defense (guilty of second-degree murder). Counsel's argument told the jurors that defendant's belief in the need to use force would have been unreasonable – under second-degree murder – if the victims were not armed. But, because the victims were armed, defendant's belief was reasonable and he, therefore, acted in self-defense and was not guilty of the charges.

¶ 37 Support for our conclusion comes from *People v. Armstrong*, 244 Ill.App.3d 545 (1993). In *Armstrong*, the issue was whether the defendant's trial counsel was ineffective, where counsel tendered an instruction on the offense of second-degree murder but told the jury that it should

disregard it. *Id.* at 553-54. Defense counsel's theory was that the defendant was not guilty because he had acted in self-defense. *Id*. We held that trial counsel was not ineffective, because counsel's argument did not deny the jury the opportunity to find the defendant guilty of second-degree murder. *Id.* Similarly, here, while defense counsel did not specifically argue to the jury in support of the lesser offense of second-degree murder instruction, nothing in counsel's closing argument precluded the jury from finding defendant guilty of that offense. See *People v. Walton*, 378 Ill.App.3d 580, 589 (2007) (noting that the tender of an instruction on a lesser-included offense gives the jury the option to convict the defendant of the uncharged lesser-included offense).

¶ 38    Finally, defendant argues that we should vacate his sentence and remand for a new sentencing hearing because an aggregate 50-year sentence (comprised of consecutive sentences of 35 years for first-degree murder and 15 years for attempt first-degree murder) is an unconstitutional *de facto* life sentence pursuant to *People v. Buffer*, 2019 IL 122327. The State agrees that defendant's sentence is a *de facto* sentence under *Buffer* but argues that because it was clear that the trial court wanted to impose a substantial prison sentence, without imposing a *de facto* life sentence, the proper remedy is for this Court to reduce defendant's aggregate sentence to 40 years.

¶ 39    It is clear from the record that the court knew of the *Miller considerations,* decided in 2012, more than five years before the sentencing in this case, and wanted to impose a substantial sentence in this case without imposing a *de facto* life sentence. It inquired of both the State and defense their view on what a *de facto* life sentence was. The State was equivocal, and the defense opined it would be a term of years of more than 49 years for the average person in the federal

system. At the time of sentencing, our supreme court had not determined what term of years would constitute a *de facto* life sentence, so the trial court fashioned a sentence that it believed was not a *de facto* life sentence as evidenced by its ultimate sentence reduction and its refusal to impose the 25-year firearm enhancement. However, it is also clear that despite the trial court's efforts and belief that the 50-year aggregate sentence was *Miller* compliant and was not a *de facto* life sentence, under *Buffer*, defendant did in fact receive a *de facto* life sentence because the sentence imposed was more than 40 years. The question is whether the *de facto* life sentence imposed complies with the directives of our supreme court related to juvenile sentencing.

¶ 40    Recently, in *People v. Lusby*, 2020 IL 124046, our supreme court reversed the appellate court judgment ordering resentencing for a 16-year-old that received a *de facto* life sentence for a 1996 murder. The appellate court found the trial court did not address Lusby's age-related characteristics; rather, it gave "a generalized statement about youth and their poor judgment." *Id.* ¶ 27. Our supreme court restated the principles initially expressed in *Holman* that are to be applied by a reviewing court where the claim is a *Miller* violation. An important, if not critical consideration, is whether a sentencing hearing was held. "A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not" (quoting *Miller*, 567 U.S. at 465). *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 735 (2016). The trial court is not required to utter "magic words" at the sentencing hearing and the trial court is not required to make a finding of fact regarding the juvenile's incorrigibility. *People v. Lusby*, 2020 IL 124046, ¶ 33, fn. 2. Referring to *Holman*, the *Lusby* court reiterated "that the inquiry looks back to the trial and the sentencing hearing to determine whether the trial court at that time

considered evidence and argument related to the *Miller* factors. *** No single factor is dispositive. Rather, we review the proceedings to ensure that the trial court made an informed decision." *Id*. at ¶ 35.

¶ 41    Consistent with the directives of *Lusby*, 2020 IL 124046 and *Holman*, 2017 IL 120665, and applying the analysis we used in *People v. Croft*, 2018 IL App (1st) 150043, *appeal denied*, 98 N.E. 2d 28 (2018), *cert denied* 139 S. Ct. 291 (2018), we look to the sentencing record to determine whether there was a constitutional violation in the imposition of defendant's sentence.

¶ 42    Looking at the record, it is clear that defendant had an extensive and detailed sentencing hearing where the trial court considered the nature of the offense, defendant's social and criminal background and, importantly, his young age. Importantly, defendant had the opportunity to present and argue any factor relevant to mitigation and urged "the Court to consider section 735/5-4.5105 in the sentencing of individuals under the age of 18 at the time of the commission of the offense, the person's age and level of maturity at the time of the offense including the ability to consider risks and consequences of behavior and the presence of cognitive or developmental disability or both, if any."

¶ 43    Before imposing sentence, the court stated:

> "For purposes of sentencing the Court has considered the evidence at trial, the gravity of
> the offense, the pre-sentence investigation report, the financial impact of incarceration, all
> evidence, information and testimony in aggravation and mitigation, any substance abuse
> issues and treatment, the potential for rehabilitation including the age of the defendant at
> the time of the offense, the possibility of sentencing alternatives, the Victim Impact

Statements and all hearsay presented and deemed relevant and reliable. The Court has
also reviewed all statements presented in writing."

¶ 44 After moving for reconsideration, defendant's initial aggregate sentence of 65 years was reduced to 50 years in the aggregate. The court's refusal to impose a 25-year firearm enhancement further evidences a thoughtful, appropriate sentence imposed after consideration of all relevant juvenile sentencing factors. As the sentencing hearings in this case complied with *Miller*, *Holman* and *Lusby*, remand for a third resentencing proceeding is not warranted.

¶ 45                                                  CONCLUSION

¶ 46 Based on the foregoing, the judgment of the trial court is affirmed.

¶ 47 Affirmed.

¶ 48 JUSTICE HYMAN dissenting:

¶ 49 I respectfully dissent because, in my view, Brannon's trial counsel performed ineffectively by failing to request that the trial court instruct the jury using IPI 3.12X. The majority recites the applicable legal principles, so I need not repeat them. I would conclude, however, that the facts of this case rendered IPI 3.12X "critical to the defense." See *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16 (discussing standard). The fairness of Brannon's trial hinged on the jury's ability to evaluate Brannon's self-defense claim entirely, and counsel's failure to request IPI 3.12X deprived the jury of the complete complement of instructions necessary for its evaluation.

¶ 50 Jurors would likely agree that a person would reasonably believe use of deadly force was justified when another person shoots or points a gun at them. Jurors also might decide that a person would reasonably believe use of deadly force was justified when another person is brandishing a weapon, though not aiming it directly at them. The question becomes much closer when a jury

17

must determine whether a person reasonably believed use of deadly force was justified preemptively before seeing a gun at all. Brannon's jury had to answer this last question: Did Branson know enough, based on his interactions with Deonte, to justify shooting before he visually confirmed either victim had a gun? As given, the instructions did not equip the jury with sufficient tools to analyze this narrow question.

¶ 51 Before going further, I want to address some analytical underbrush because the State's litigation decisions significantly weaken its argument against *Strickland* prejudice. The State does not dispute that the trial court would have abused its discretion by failing to give IPI 3.12X had Brannon's counsel requested it, meaning the State concedes that the evidence legally entitled Brannon to the instruction. Relatedly, the State does not dispute that trial counsel performed deficiently by failing to request IPI 3.12X, meaning the State concedes no defensible strategy exists for failing to request the instruction. While prejudice under *Strickland* must exist apart from the underlying merits or counsel's deficient performance, everyone agrees the instruction should have been given. How then can we retain confidence in the outcome of Brannon's trial when the trial court failed to give the instruction? In my view, we cannot.

¶ 52 Showing prejudice for counsel's deficiency under *Strickland* is a low bar. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45 (noting prejudice where chance that competent counsel would have won acquittal is "significantly less than 50%") (quoting *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008)). For Brannon's ineffectiveness claim to succeed, we need enough evidence of prejudice to "undermine [our] confidence in the outcome." *Id.*

¶ 53    Again, the State's *only* argument against a finding of prejudice comes from its reliance on the other instructions the trial court gave the jury. The State focuses primarily on one instruction about lawful justification, to which I will add emphasis at the critical points:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is *necessary* to defend himself against the *imminent use* of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is *necessary* to prevent *imminent death or great bodily harm* to himself." See Illinois Pattern Instructions, Criminal, No. 24-25.06 (approved July 18, 2014).

¶ 54    As I observed at the outset, there are factual scenarios in which the reasonableness of a defendant's use of force is evident because of the necessity to defend against imminent unlawful force, bodily harm, or death. Here, those facts are murky.

¶ 55    Kevon's statement showed he and Deonte both had guns. But Kevon also said no one else had been shooting when Brannon shot them, and no one else had pulled out their guns yet. Brannon, in contrast, testified that he knew from conversations with Deonte that Deonte intended to shoot him and shoot to kill. According to Brannon, Deonte had pulled a gun on him and threatened him the day before the shooting. Deonte repeated his threat the day of the shooting. Deonte reached for his waistband, which is when Brannon shot him in the back. Kevon similarly reached for his waistband when Brannon shot him.

¶ 56    Resolving these competing narratives depends on the jury's willingness to believe the *Lynch* evidence about Deonte's threats. If the jury believed Kevon, then perhaps Brannon's actions were unnecessary to prevent imminent force, bodily harm, or death; if

19

the jury believed Brannon, however, perhaps his actions were necessary to avoid imminent force, bodily harm, or death.

¶ 57    The record shows that the jury struggled to resolve this dispute. The majority's discussion omits the questions the jury asked during deliberations. Most relevant, the jury asked for the "[d]efinition of lawful justification" and "a copy of the justified force, entire article of the Illinois Criminal Code." Both questions indicate active deliberations about what it meant for Brannon's actions to be justified based on the facts. Only IPI 3.12X told the jury that it was within their province to determine whether Deonte had threatened Brannon both the day before and the day of the shooting. And, if they believed he had, they could "consider that evidence in deciding whether the State has proved beyond a reasonable doubt that the defendant was not justified in using the force that he used." Illinois Pattern Instructions, Criminal, No. 3.12X (approved July 18, 2014).

¶ 58    On these facts, IPI 3.12X was "critical to the defense." See *Falco*, 2014 IL App (1st) 111797, ¶ 16. Importantly, Kevon's statement supported parts of Brannon's testimony about acting in self-defense. Kevon admitted that he and Deonte were armed and that Deonte and Brannon argued. Kevon's statement contains no information about that interaction between Brannon and Deonte the day before the shooting. There is also no discrepancy between Brannon's narrative of events and the physical evidence—Brannon admitted he shot Deonte in the back.

¶ 59    Giving the jury the general instruction about lawful justification falls short. Determining whether Brannon's actions were necessary to prevent imminent harm depended almost entirely on evaluating the credibility of his *Lynch* testimony. Counsel's

20

failure to request IPI 3.12X—an instruction justified by the evidence as a matter of law—left the jury uninformed when trying to decide the critical issue before it. There is, at least, a "significantly less than 50%" chance that requesting IPI 3.12X would have resulted in a different outcome. See *Lucious*, 2016 IL App (1st) 141127, ¶ 45. I respectfully dissent from the majority's decision to affirm.

¶ 60 In my original dissent, I concurred with the majority's faithful application of *People v. Holman*, 2017 IL 120655 and *People v. Lusby*, 2020 IL 124046, while expressing my skepticism about the soundness of those decisions. After reviewing Brannon's petition for rehearing, I dissent from the majority's sentencing judgment as well. As I read the record, the trial court did not intend to impose a life sentence. But it based its calculations to avoid a life sentence on arguments the State made about the likelihood Brannon would survive his sentence. This theory garnered just one vote in *People v. Buffer*, 2019 IL 122327. I would remand for the trial court to determine whether, after *Buffer*, it believes the same sentence is warranted.

¶ 61 After considering the petition for rehearing, I no longer understand this case to be about the sufficiency of the trial court's findings under *Holman* and *Lusby*. Instead, it is about conforming Brannon's sentence to the trial court's intent. At the hearing on Brannon's motion to reconsider sentence, the State argued "that a term of 82 years is not necessarily a *de facto* life sentence for somebody who was 17 when they committed the offense" because "when they are released into their 60's and 70's" they have not served a life term. Understanding that Brannon could potentially survive his sentence, the trial court imposed its new sentence.

¶ 62   In *Buffer*, however, our supreme court rejected survivability as the standard for determining the life sentence of a juvenile offender. *Id.*, ¶¶ 33-34. Only then-Justice Anne Burke would have used a juvenile defendant's age at the time of release as the benchmark for determining what constitutes a *de facto* life sentence. *Id.*, ¶ 67 (Burke, J. concurring). In my view, the trial court's understanding of the law, for which it had no fault because *Buffer* remained undecided, would alone warrant remand for resentencing.

¶ 63   But compounding the need for a new sentence is the trial court's effort to craft a sentence that would be technically survivable for Brannon. Even operating under the now-rejected survivability rubric for *de facto* life sentences, the trial court seemed determined to impose a sentence that would not be a life sentence. The only way to ensure Brannon's sentence conforms to the trial court's intent is to remand so the court can impose a sentence with the understanding that sentences of 40 years or more are considered *de facto* life sentences in the State of Illinois.

¶ 64   I emphasize that I express no opinion on whether the trial court's current sentencing findings would pass muster under *Holman* and *Lusby*. I conclude that, based on the record, the trial court did not intend to impose a *de facto* life sentence and, yet, under *Buffer*, that is precisely what it did. Brannon deserves, at minimum, further consideration of his sentence given this change in the law.