THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES COLLINS, Defendant-Appellant.

First District (4th Division)   No. 1—89—1669

Opinion filed April 25, 1991.

Randolph N. Stone, Public Defender, of Chicago (John T. Kennedy, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Daniel Rabinovitz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Defendant, Charles Collins, was convicted of first degree murder and sentenced to 26 years of imprisonment. He appeals from his conviction on two grounds: (1) evidence of the drunken struggle between him and his roommate supports only a finding of second degree murder; and (2) the Illinois homicide statute, which sets out first and second degrees of murder, violates Federal and State constitutional provisions that guarantee due process of law, equal protection of law, and the separation of powers doctrine.

For the reasons that follow, we reduce the murder conviction from first to second degree and remand for resentencing.

BACKGROUND

On February 4, 1988, Collins was arguing with his roommate of

several years, James Langston. At some point Langston was fatally shot. Collins telephoned police and told them, "My friend was wrestling with a gun. He got shot. We were wrestling with the gun and the gun went off." He also asked for paramedics to be sent to the apartment where he lived with the shooting victim.

Percy McCline testified for the prosecution that he had been present during the fight and watched the shooting as he stood in the living room of the apartment. He had been good friends and drinking buddies with Langston for 23 years and would meet him twice a week for drinks. McCline had known Collins for 12 to 15 years, but he was closer to Langston.

McCline and a friend of his named Joe arrived at the apartment at 7:15 in the evening. Langston and Collins were there. Collins left and returned with Garland Burton. Then McCline and Collins went to a liquor store. Collins left McCline off at the apartment and went on to get a haircut.

While Collins was gone, McCline, Burton, and Langston had three or four shots of liquor. Joe fell asleep. According to McCline, Collins returned from getting his hair cut at 9:30 or 10. Collins and Langston went into the kitchen and talked for awhile and when they came out they were arguing about a gun. McCline testified that after awhile Collins pulled a gun out of the right side of his pants. Langston ran from the living room down the hall into the dining room. According to McCline's direct testimony, Collins held the gun straight out in front of him and fired. McCline then contradicted or clarified that description by stating that Collins had pointed the gun up toward the ceiling before firing. A police officer later testified that his inspection of the apartment revealed no bullet holes in the ceiling or walls.

McCline further testified that Collins and Langston "approached each other in the hallway *** started tussling; [and] fell on the floor in the dining room." The two men continued to wrestle on the floor, with Langston on top at first and then Collins on top. McCline testified that he watched this altercation from the living room, looking down the hallway, and could not see the gun. When Langston was on top of defendant, however, he heard a gunshot and saw Langston fall off. According to McCline, Collins picked up a nearby ironing board and hit Langston two or three times in the area of his back or head. Langston was lying on his stomach with his face to the side.

McCline suggested pouring water on Langston to revive him, which Collins did. When Langston failed to respond, Collins poured more water on him, then turned him over on his back. That is when they saw the blood and realized that he had been shot. McCline then

left because he was frightened. About two weeks later the police found him and questioned him.

According to McCline, Collins is not a violent man. Langston, however, had a temper and could be violent. McCline said that Langston cut him with a knife once and owned a gun. Usually, Langston had a gun somewhere.

Next to testify for the State was a crime lab technician for the police department, Joseph Moran. When he arrived at the scene after the shooting, he noticed that the body and surrounding floor were soaking wet. Another officer handed Moran a gun that was found in the apartment. It had four cartridges inside the chamber and two casings inside the cylinder. Moran administered gunshot residue tests at the crime scene, one on defendant and the other on Langston. The results of both tests were inconclusive.

The parties stipulated that the testimony of another witness would have shown that Langston died as a result of a gunshot wound to the chest that passed through his heart and that there were two lacerations on the back of the victim's head. Photographs in the record indicate that the bullet entered Langston's chest near the left armpit.

Next to testify for the State was a firearms expert with the police department, Robert Smith. He examined the gun used in the shooting and noted that the .32 caliber revolver had a bent trigger guard, which prevented the trigger from moving forward. He said this meant that the weapon was in a "single-action" mode, and for a second shot to be fired, it would be necessary to open the cylinder, manually rotate it to put another live cartridge in the chamber, and then pull the hammer back.

Kevin O'Brien testified for the State that he went to the crime scene, where he was met at the door by Collins. Collins told him that he and Langston had been arguing and struggling and the gun just went off. The gun was submerged in dishwater in the sink. Collins did not resist arrest and was cooperative.

For the defense, a stipulation was entered that Detective John McKenna would testify that McCline had told him that he (McCline) had stayed in the living room and did not see the fight when the shot was fired.

Collins testified that Langston had a violent temper and liked to fight when he drank. When he returned to the apartment on the night of February 4, he called Langston to the back and said he wanted to talk to him. According to Collins, Langston came in when Collins was checking his hair in the bathroom. Collins said Langston

grabbed for his penis and Collins hit him in the head. Then Langston went back as if nothing was wrong and called out to ask Collins where the gun was. Collins said it was under the ottoman. According to Collins, Langston walked toward him with the gun and Collins grabbed his hand. They struggled for it and fell in the dining room. Collins heard a shot and both got to their knees. The gun fell, they dived for it and continued to struggle while standing until Langston staggered and fell. Collins went into the living room but did not see anyone else in the apartment. He called police and went upstairs to get a neighbor.

Collins denied hitting Langston with the ironing board. The gun was Langston's, not his. He also said the gun was fired only once that night.

The trial court noted conflicts in Collins' testimony and found no reason to disbelieve McCline. The court found Collins guilty beyond a reasonable doubt of first degree murder and imposed a prison term of 26 years.

OPINION

I

Before reaching the constitutional challenges, Collins asserts that the evidence does not support the first degree murder conviction because of mitigating factors that should have reduced the degree of the offense to what was formerly called voluntary manslaughter and now is second degree murder. Ill. Rev. Stat. 1989, ch. 38, par. 9—2.

According to Collins, the salient facts establish that he and Langston were long-time roommates who had been drinking heavily on the night of the shooting and in the course of an argument and struggle the gun went off, killing Langston. McCline testified regarding Langston's propensity for violence and the fact that Langston had cut McCline on one occasion. Both Collins and McCline testified that Langston kept a gun.

Collins contends that the evidence fails to show that he acted with a murderous intent but at most shows that his mental state was that required for a reduction of the offense to voluntary manslaughter, or in this case, murder in the second degree. He relies primarily on *People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409, a case in which the defendant's conviction of murder was reduced on appeal to voluntary manslaughter.

In *Ellis*, the defendant had picked up a hitchhiker and let him share defendant's apartment for a week. When the defendant told

him to leave, he would not. After a day of drinking, the defendant got out a revolver and ordered the other man to leave. The defendant fired a warning shot to intimidate him. As the other man began to leave, he lunged at the defendant and the two struggled over the gun. The gun went off, and the other man was shot in the head. The defendant went to get a neighbor for help and when police arrived, told them he "didn't mean to shoot him."

After reviewing the facts, the appellate court concluded that the defendant's acts had exceeded those justified by self-defense. The court also found that defendant had initiated the use of deadly force. Nevertheless, the court found the evidence insufficient to establish the requisite intent for murder. Noting that conviction for voluntary manslaughter is a "legal compromise" between murder and acquittal, the court held that the fact defendant had gotten the gun and fired a preliminary shot did not bar a finding of voluntary manslaughter; instead, it barred exoneration. *People v. Ellis*, 107 Ill. App. 3d at 611, 437 N.E.2d at 416.

In *People v. Dare* (1986), 140 Ill. App. 3d 413, 488 N.E.2d 1304, this court upheld the trial court's finding that the defendant's killing of his common-law wife constituted voluntary manslaughter instead of murder. The facts established that the defendant and his common-law wife were alcoholics who fought frequently and came to blows on numerous occasions. Defendant stabbed the victim four times after an argument in which he accused her of failing to buy him liquor. On appeal from his conviction of voluntary manslaughter, the defendant argued that the facts could not be reconciled with voluntary manslaughter; therefore, he only could be convicted of murder or acquitted. The reviewing court disagreed and affirmed the voluntary manslaughter conviction. See also *People v. Hamilton* (1977), 48 Ill. App. 3d 456, 363 N.E.2d 193 (reducing voluntary manslaughter conviction to involuntary manslaughter in a case in which victim's fingerprints were found on the gun that the parties struggled over).

The State counters with the argument that even if the evidence fell short of proving a deliberate intent to kill Langston, Collins' actions demonstrated his knowledge that struggling while holding a loaded gun created a strong probability of causing death or great bodily harm to another, which is one of the alternative definitions of first degree murder. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2).) The State argues that the facts of this case are analogous to those of *People v. Gross* (1988), 166 Ill. App. 3d 413, 519 N.E.2d 377, *appeal denied* (1988), 121 Ill. 2d 576, 526 N.E.2d 835. In *Gross*, the court affirmed a murder conviction, commenting that the defendant took a

loaded gun with him to an area where an argument had just occurred and, with his finger on the trigger, he struggled with the victim. Therefore, the court reasoned, the defendant's story that the gun was fired accidentally or that the gun went off in a struggle was not binding and the defendant could be found to have voluntarily and willfully committed an act that was bound to destroy another's life or inflict great bodily harm. Murderous intent could be inferred from the defendant's actions, and there was no evidence that would give rise to a finding of manslaughter.

We note that the circumstances surrounding the shooting in the pending case are not free from doubt. We agree with the State that the court is not required to believe the defendant's story and that the trial court's findings are accorded great weight in the reviewing court. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) The problem with the State's case, however, centers on the "two shot" theory that the State employs to support the finding that Collins had the requisite mental state for first degree murder. The evidence surrounding the "first shot" is problematical for two reasons. First, McCline waffled in his description of this shot. Initially he seemed to imply that Collins aimed the gun directly at the fleeing Langston's back, an act certainly indicative of an intent to kill. Quickly, however, he retracted that implication by clarifying in his direct examination and again in cross-examination that, in fact, Collins had fired the gun up toward the ceiling. This demonstrates a radically different mental state, one similar to that of the defendant who fired a warning shot in *Ellis*. The ensuing struggle that McCline described cannot, in our opinion, justify the finding of first degree murder because the two men were rolling around and McCline admitted he did not observe the gun or actual shooting.

The second problem with the "first shot" evidence is a conflict in the record regarding whether, in fact, there were two shots fired instead of one. While McCline testified that two shots were fired (and there were two empty cartridges found in the gun), Officer Moran testified that his visual inspection of the crime scene revealed no bullet holes in the ceiling or walls. As a trained police officer, Moran presumably knows how to conduct a thorough observation of a crime scene and would be able to recognize holes that might have been made by bullets. Collins denied firing the gun more than once. Significantly, no second bullet that might have been fired was recovered from the scene. We believe the lack of physical evidence supporting McCline's statement that there was a first shot—coupled with his inconsistent descriptions of that shot and his admitted drinking at the

time—greatly undermines the credibility of the first shot evidence.

The theory that Collins fired two shots is critical to the State's ability to establish that Collins acted with the mental state necessary for first degree murder. This is so because the firearms expert testified that in his opinion a shooter could not fire the gun a second time without taking the deliberate step of opening the gun, manually rotating the cylinder to chamber another live round, and pulling back the hammer after closing the gun. Such calculation implies premeditation. But here again, there is no supporting evidence that might justify such an inference. Indeed, McCline would have been the logical witness to notice Collins fiddling with the gun after the so-called first shot. McCline said he watched the entire struggle, which from that point lasted 30 or 40 seconds. If that is true, it is reasonable to assume he would have noticed Collins breaking open the gun to rotate the cylinder and then snap it back in place before he followed Langston. But McCline did not so testify; instead, he saw the two men "approach each other" and begin "tussling" on the floor locked together with first one then the other on top. It is improbable that Collins could have opened the gun and spun the cylinder while struggling with Langston. McCline testified that when the gun went off Langston was on top of Collins. He fell off, onto his stomach, and lay still. It was not until Collins poured water on Langston to revive him and then rolled him over on his back that they saw the blood and realized he was dead. We believe that such facts are consistent with second degree murder rather than first.

McCline admitted that he and the others had been drinking. He did not come forward or call the police. He told them at first he had seen nothing. On the whole, his trial testimony seems to support the defense claim to the mitigating mental state of second degree murder. Except for him and Collins, none of the others present at the shooting testified. It was stipulated that Collins called 911 to alert the police and to get an ambulance. He gave his name and address to the person on the emergency line and admitted that he and his friend were wrestling with the gun when it discharged. That his trial testimony describing the struggle contained weaknesses and contradictions did not relieve the State from proving that his mental state was sufficient to sustain a conviction for first degree murder under all of the facts.

The volatile mixture of guns and tempers too often explodes into death, even among close friends and family members. The argument could be made in every resulting homicide prosecution that the defendants knowingly created a strong probability of causing death or great bodily harm because such harm is implicit in the use of loaded

weapons. Hence, it could be argued that no defendant who carries or reaches for a deadly weapon while arguing with another could ever prove the mitigating mental state of second degree murder. The court in *Ellis* found otherwise, however, even while noting that the defendant in that case had initiated the unjustified use of deadly force. In *Dare*, the defendant clearly was the aggressor and had a history of abusing the victim as well as alcohol. The knife he stabbed her with four times was no less deadly than the gun that Ellis or Collins grabbed. And in *Hamilton*, the struggle over a loaded weapon ended with the death of one person and the defendant's conviction of voluntary manslaughter. The reviewing court reduced the conviction to involuntary manslaughter because of fingerprint evidence tending to show that the victim held the gun part of the time. The court declined to reverse the conviction outright, however, noting that the defendant had "acted *recklessly* in drawing a loaded weapon during the course of a quarrel." (Emphasis added.) 48 Ill. App. 3d at 458, 363 N.E.2d at 195.

■ The reasoning of these cases suggests that reviewing courts must examine the facts of specific cases before concluding that the use of a gun in an argument, without more, satisfies the inference of murder in the first degree as opposed to lesser included offenses.

The pending case, in our opinion, more closely resembles *Ellis*, *Dare*, and *Hamilton* than *Gross*. As in *Ellis* and *Dare*, here the defendant and victim were living together, had been drinking just before the fatal argument, and, most tragically, had a deadly weapon close at hand. In *Hamilton*, the facts indicated that the gun was discharged during a struggle over its possession. In *Gross*, the facts are noticeably different. There, the defendant argued with the victim and left to obtain a gun. He admitted that his finger was on the trigger when he went back to confront the victim, but testified that the shooting was accidental because the victim came up from behind and grabbed him, causing the gun to fire when defendant reached back to hit at the victim with the gun. The defendant's testimony of how he shot the deceased contradicted the medical evidence regarding the path that the bullet took, however. We believe the facts of *Gross* make its holding inapplicable to the case before us.

■ We conclude that the evidence of record is too inconclusive, vague, and contradictory to sustain Collins' conviction of murder in the first degree. There is sufficient evidence, however, to support a conviction of second degree murder. We do not wish to understate the gravity of Collins' actions, nor exonerate him from the consequences of his criminal conduct. We nevertheless find that the degree of mur-

der should be reduced under the specific circumstances of this case. Pursuant to Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3)), we reduce the grade of offense from first to second degree murder and affirm it as modified. The cause must be remanded for resentencing also.

## II

■ Collins also raises constitutional challenges to the homicide statute. We decline to reach these issues, however, because of our holding that the evidence in this case failed to establish the requisite elements of first degree murder. We note that another court has upheld the statute against a due process challenge quite similar to the one made here. (*People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335, *appeal denied* (1991), 136 Ill. 2d 547, 567 N.E.2d 335 (rejecting the contention that the Illinois homicide statute violates due process by requiring defendants to prove the mental state necessary to reduce first degree murder to second degree murder).) Collins' equal protection argument depends for its success on the notion that it is unfair for one class of defendants (accused murderers) to be required to prove a mitigating mental state when other classes of criminals have no such requirement. We do not find the argument welltaken but need not decide the issue because it is not necessary to the disposition of the case before us. Finally, the record indicates that Collins has raised the separation of powers argument for the first time on appeal and accordingly has waived it.

For the foregoing reasons, we affirm Collins' murder conviction as reduced to second degree murder and remand for resentencing.

Affirmed as modified and remanded.

JOHNSON and McMORROW, JJ., concur.