**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190120-U

Order filed August 5, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Fulton County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0120 Circuit No. 16-CF-154 |
| | ) | |
| KEVIN D. CLENDENNY, | ) ) | Honorable Thomas B. Ewing |
| Defendant-Appellant. | ) | Judge, Presiding |

JUSTICE O'BRIEN delivered the judgment of the court.
Presiding Justice McDade concurred in the judgment.
Justice Schmidt dissented.

**ORDER**

¶ 1     *Held*:  Evidence did not support conviction for first degree murder, which is reduced to involuntary manslaughter and the cause remanded for sentencing.

¶ 2     The defendant was convicted by a jury of first degree murder and sentenced to a 32-year term of imprisonment. He appealed his conviction and his sentence. We reverse his conviction for first degree murder, reduce it to involuntary manslaughter and remand for sentencing.

¶ 3                                    I. BACKGROUND

¶ 4        On August 23, 2016, the defendant, Kevin D. Clendenny, shot and killed his brother, Greg Clendenny. The defendant lived with Greg and Greg's partner, Jamie Mabis, in a home that Greg owned. At that time, the defendant was 57 years old and Greg was 61 years old. The defendant had lived with Greg for four years and Mabis had lived with them for a majority of that time. During their tenure as roommates, the defendant and his brother had a number of alcohol- and drug-fueled arguments. On two or three occasions during these disputes, Greg would retrieve his shotgun, point it at his head, and ask the defendant to pull the trigger. The defendant never pulled the trigger during these incidents. On August 23, 2016, however, the two brothers spent the night drinking and using cocaine and began to argue. Greg grabbed his shotgun, held it to his face and asked the defendant to pull the trigger. This time, the defendant did pull the trigger and the shot killed Greg. The defendant left the house on foot and was soon arrested. The defendant was charged with first degree murder, aggravated discharge of a firearm and aggravated domestic battery. The State proceeded to trial on amended charges.

¶ 5        The parties stipulated that Greg died from a gunshot wound to the head between 6 and 7 a.m. on August 26, 2016. The autopsy report indicated that Greg had cocaine metabolites in his blood at a recreational level and a blood alcohol content of 0.149 at the time of his death. According to the report, symptoms from cocaine use include euphoria, excitement, restlessness, risk taking, sleep disturbance and aggression. Physical evidence from the scene included a shotgun slug that was found in the ceiling above Greg's body. A "plastic wad from a shot shell" was discovered next to Greg's body and a fired shot shell was on the floor in the corner of the bedroom where the body was located. A Remington semi-automatic shotgun was found in the upstairs bedroom and contained the defendant's fingerprint on the "receiver area" between the grip and barrel. A bloody footprint from a bare foot was visible near Greg's body.

¶ 6        Jeff Standard, the Fulton County sheriff, testified that he received a "shots fired" call as he was driving to work on the morning of August 23, 2016, and responded to the scene. As he arrived, he was stopped by two women who said the defendant was walking up the street. He observed the defendant walking barefoot with a slumped posture. Standard approached the defendant and asked him what was up with Greg. The defendant responded, " 'He asked me to shoot him, I did not want to.' " He said the gun was in the house. At that point, Standard handcuffed the defendant, put him in the squad car and returned to the house. Standard's report indicated he believed the defendant was intoxicated although he could not recall that fact at trial. On cross-examination, Standard acknowledged he was familiar with Greg's house from prior calls for incidents with Greg and other individuals. He could not say the defendant had been involved in those previous incidents.

¶ 7        Fulton County Sheriff's Deputies Jonathon Webb and Barry Blackwell interviewed the defendant twice on August 23, 2016. The interviews were recorded and both Webb and Blackwell testified consistent with the recordings. Webb additionally testified that he drove the defendant to the jail. Webb did not converse with defendant enroute but overheard him saying to himself, "it's a terrible thing," "people get what they deserve," and "I used to work at the post office *** can you just drop me off here." Webb was familiar with the effects of drugs and alcohol and did not see any signs of impairment in the defendant. On cross-examination, he said there were no fingerprints found on the shotgun shell or on the trigger of the gun. He acknowledged he and Blackwell told the defendant that Mabis told law enforcement that Greg told her during a phone call that the defendant had a gun to Greg's head, but the statement was not true. Webb described the defendant as truthful, cooperative and emotional. He believed what the defendant told them. Blackwell additionally testified that the defendant was fidgety during the interviews and did not display any emotion.

¶ 8       The interview recordings were played for the jury. At the beginning of the first interview, the defendant stated, "It's a terrible thing" and "No doubt I'm going to spend the rest of my life in prison because I'm an old man." He had no children, had never been married, and worked for the United States Postal Service for over 20 years until he was terminated after he tested positive for cannabis. He had not worked in the past 10 years. His daily routine consisted of walking up the road to his sister's house and carrying water from the creek for her garden. He did not have a driver's license. He drank daily, including "buzz beer," vodka, or whiskey, but mostly beer. He had drunk "quite a bit" the prior evening.

¶ 9       Greg and Mabis had gone to a concert that night. Mabis did not like the defendant. After they returned from the concert sometime between midnight and 2 a.m., Greg wanted to continue drinking and partying. The defendant and Greg drank "buzz" beer and Everclear "cherry juice," which was cherries soaked in Everclear. Mabis, Greg and the defendant used cocaine. "The Doctor" brought more cocaine around 3 a.m. and the defendant "got pretty lit up on that." He was also intoxicated. This incident was not the first time Greg had approached him with a gun asking the defendant to pull the trigger. The defendant explained the dynamics of previous arguments with Greg, describing that Greg would be in a "total craze," "nuts." The defendant described: "he literally man, he'd be like, he'd put the fucking barrel in his mouth, and he'd look at me" and say, " 'You pull the trigger.' " Greg would say to him, " 'I'm not going to squeeze the trigger.' " The defendant further said, "Obviously, I did." The other times he said no. To the best of the defendant's recollection, Greg confronted him and was "getting in his face" that morning. Greg had ahold of the gun.

¶ 10       The other incidents where Greg confronted him with a gun occurred two or three times in the prior five years. Greg would become violent when he drank hard liquor. Greg would preach at

4

the defendant. The defendant would tire of it, acknowledging he "can only take so much." The two usually argued about Greg's girlfriend, whom the defendant said hated him simply because he was there, and her hatred influenced Greg. Greg would take Mabis's side in the arguments. The defendant did not think Mabis was there during this confrontation, but he did not know where else she would be. The incidents were instigated by Greg drinking hard liquor, which would make him violent. He would start "preaching" at the defendant and talk condescendingly to him. The defendant would tell Greg there was no need to be self-righteous. That morning, Greg was "saying the usual crap," calling the defendant a sinner. When the defendant went to his bedroom to escape the confrontation, as was his practice, Greg followed him. Greg then retrieved his shotgun, put the shotgun barrel in his mouth or near his face and told the defendant to pull the trigger. After the gun went off, the defendant put the gun down and left. He said Greg was holding the gun but then admitted he could not say if he was supporting the gun too. He answered, "I reckon so" when asked whether he put his right hand on the trigger. He acknowledged he must have held the gun because he laid it down, it did not fall. He replied "I reckon that's fair" when told he must have laid the gun down.

¶ 11        He did not know if Greg kept his guns loaded but did not think he kept live rounds in them for safety purposes. The gun was usually stored in a case in the corner of the spare bedroom and the ammunition was stored in a hutch off the kitchen and in Greg's hunting coat. He could not remember but he "must have" heard Greg load the shotgun. He adamantly denied that he retrieved the gun, that it was "not [him] shooting [Greg]" and saying, "I'll kill you." He was certain that Greg brought out the gun. "I can assure you. I did not chamber no shell." He again denied holding up the gun at Greg and said he would not grab a gun. He refused to agree with Webb and Blackwell that he instigated the gunplay.

5

¶ 12    Webb informed the defendant that Mabis told law enforcement that when she talked to Greg on the phone after she had left the house that morning, he told her the defendant had a gun to his head. The defendant denied he did and surmised that Greg said that because it was actually Greg holding the gun to his own head as he had done before. The defendant did not recall the phone call between Greg and Mabis.

¶ 13    The second interview took place at approximately 4:30 p.m. The defendant said he and Greg had started drinking beer and Everclear the previous afternoon around 4:30-5 p.m. After Greg and Mabis left for the concert, he ate dinner, read, and must have dozed off on his bed. That would be his usual routine but he could not remember the prior evening as things were vague. He woke up when Greg and Mabis returned home, which in his estimation was around midnight. The defendant went out to the kitchen, where Greg handed him a bag of cocaine. He and Greg continued drinking beer and Everclear. He overheard Mabis and Greg talking about her leaving but he was not aware that Greg was going to move with her. The defendant and Greg began to argue but he could not remember the subject. It could have been about Mabis but it was not about Greg moving out and leaving the defendant behind. They did not become physical although on other occasions Greg would shove him. He could not remember how long they argued.

¶ 14    When these incidents happened before, he would remove himself. Sometimes Greg would follow him. This time, he did and the gun came out. The defendant stated that the best he knew, based on what happened on the prior similar occasions, that Greg said to pull the trigger. He admitted, that "obviously [he] pulled the trigger at some point." He could not remember Greg saying he wanted to die but he had said it before. "The best" that the defendant remembered, he was in his bedroom when Greg had the gun and Greg was "on his ass." They were face to face, the way he remembered it. Greg came in right behind the defendant. Greg did not hand him the gun

6

and say, "kill me." He did not remember it that way but was not absolutely certain. After the shooting, although it was a blur, the best he could recall, he put the gun down, left the house, and started walking. He was certain he must have known that when he pulled the trigger it would end Greg's life. There was a high likelihood to cause death if the gun was loaded. He could not say if he knew it was loaded. He did not remember the gun being racked. He guessed the gun was not already loaded. After he pulled the trigger, Greg's body dropped and he was pretty certain Greg was dead. His reaction was "panic, I'm sure." He was also pretty certain he did not leave the bedroom and return but acknowledged it was possible since there was a bloody footprint pointing into the room. He guessed he went back in to check on Greg but he could not remember. He left the house and headed toward his sister's house to hide there. He was soon arrested.

¶ 15    To the deputies' inquiry as to why he killed Greg, the defendant responded that "things went off the deep end." When Blackwell again asked why the defendant killed Greg, the defendant said, "I guess because he kept pushing me. I guess that's about all I can really reply. No excuse. Shit from [Mabis] building up." He said he had "turmoil inside for a while." He loved his brother, but Greg would behave "that way" when he would criticize the defendant. Things would escalate when drinking was involved. When asked if the buildup caused him to pull the trigger, the defendant responded, "Reckon so, reckon that's true. Came to that point. He pointed the gun, as he did before. As far as I remember, it was him pointing the gun at himself." In the defendant's opinion, bringing in a gun amounted to taunting, as well as Greg's comments such as "You pull the trigger." He denied he was so angry that he retrieved the gun. He said, "reckon so," when asked if he was angry enough to pull the trigger. He again denied retrieving the gun.

¶ 16    Mabis testified that on August 22, 2016, she and Greg planned to attend a concert with some friends and family. Greg began drinking around 4:30 p.m. and had purchased cocaine for the

7

occasion. At the concert, Greg drank beer and used the majority of the cocaine. After the concert, Mabis and Greg went to a bar and returned home around 2 a.m. They finished the cocaine and Greg drank more beer and perhaps ate some cherries he had soaked in Everclear. She and Greg discussed her idea of buying a trailer so they could live without the defendant. She thought the defendant may have overheard their discussion. A crack dealer stopped by and Greg gave him some money for cocaine, which the dealer was to deliver later. The dealer did not return with cocaine and the defendant "started getting loud." By 6 a.m., the defendant was pacing and yelling as he typically did when intoxicated. Greg went upstairs to his bedroom and the defendant went outside where he continued yelling. Mabis was worried about disturbing the children who lived next door, so she asked Greg to do something about the defendant. The defendant came back inside to his bedroom, and Greg went into the bedroom and yelled at him.

¶ 17        Mabis then left the house. She immediately called Greg and asked him to calm down. Greg said that the defendant was going to have to explain to Greg's four daughters what he had done and hung up. She called Greg's sister for help, but the sister hung up on her. Mabis went to Casey's and then to a bar. She tried to call Greg again, but he did not answer. She returned home around 7 a.m. When she entered the house, she saw Greg's shotgun on the kitchen floor. She brought it upstairs to her and Greg's bedroom. She noticed Greg was not in bed and returned downstairs where she found his body in the doorway to the defendant's bedroom. She grabbed the phone, ran out of the house and called 911.

¶ 18        Mabis testified to an incident that took place between the defendant and Greg shortly after she moved into the house. After the defendant swore at her, Greg began screaming at the defendant, asking whether Greg was a burden to the defendant. Greg gave the defendant his shotgun and said, "If I am such a burden to you, brother, then put me out of your misery." Mabis could not recall

8

how the defendant reacted but knew no one was hurt in the incident. She did not know if the gun was loaded. Mabis was aware of other similar incidents between the brothers but was not present when they took place.

¶ 19    On cross-examination, Mabis said that prior to her leaving the house on August 23, she heard Greg say to the defendant, "What do I have to do, get a gun to get you out of here?" Greg was angry about the defendant's disrespectful attitude. Greg kept his guns in the spare bedroom. She never saw the defendant use a gun toward Greg. Mabis acknowledged that she and Greg had separated several times, one time which was due to Greg's failure to do anything about the defendant and the defendant's behavior toward Mabis.

¶ 20    The defendant presented one witness, Brad Ward, a Fulton County Sheriff's Department sergeant, who testified that he applied for the search warrant for the Clendenny house and the application included a statement from the sheriff's report that indicated the defendant was intoxicated when he was arrested. The defendant rested. During its closing argument, the State asked the jury to find the defendant guilty of first degree murder, not involuntary manslaughter because the shooting was not an accident.

¶ 21    The defendant submitted jury instructions on first degree murder, second degree murder and involuntary manslaughter. The jury was also instructed on the definition of "knowing" as a mental state for first degree murder and "reckless" as the mental state for involuntary manslaughter. The jury convicted the defendant of first degree murder, aggravated discharge of a firearm and aggravated domestic battery. The State thereafter nolle prossed the aggravated discharge and domestic battery counts, and sentencing proceeded on the murder conviction. The State sought a 35-year sentence while the defense sought the minimum 20-year sentence. The trial court sentenced the defendant to a term of imprisonment of 32 years. The defendant sought

reconsideration of his sentence, which the trial court denied. The defendant timely appealed. This court allowed an amended notice of appeal to be filed on February 19, 2020.

¶ 22                                    II. ANALYSIS

¶ 23        The defendant raises three issues on appeal. He challenges the evidence as insufficient to prove him guilty beyond a reasonable doubt of first degree murder and urges this court to reduce his conviction to involuntary manslaughter. He also challenges the State's closing argument and the imposition of the 32-year sentence. Because we find the first issue dispositive, we will address only the defendant's claims regarding the sufficiency of the evidence.

¶ 24        A person commits first degree murder when he kills an individual without lawful justification if in performing the acts causing the death, "he or she knows that such acts create a strong probability of death or great bodily harm to that individual." 720 ILCS 5/9-1(a)(2) (West 2016). A person acts knowingly when "he is consciously aware that his conduct is practically certain to cause a particular result." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26. Knowledge is generally demonstrated with circumstantial evidence, not direct proof. *Id.* To prove first degree murder, the State does not need to show the defendant had a specific intent to kill; rather, it is sufficient if the State establishes that the defendant " 'voluntarily and wil[l]fully committed an act, the natural tendency of which was to destroy another's life.' " *People v. Bartall*, 98 Ill. 2d 294, 307 (1983) (quoting *People v. Latimer*, 35 Ill. 2d 178, 182-83 (1966)).

¶ 25        A person commits involuntary manslaughter when he unintentionally kills another person without lawful justification "if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2016). Conduct is considered reckless when an "individual consciously disregards a substantial and unjustifiable risk that a result will follow and such

10

disregard is a gross deviation from the standard of care that a reasonable person would exercise under the same circumstances." *Castillo*, 2018 IL App (1st) 153147, ¶ 27.

¶ 26 First degree murder and involuntary manslaughter are differentiated by the defendant's mental state. *People v. Eubanks*, 2019 IL 123525, ¶ 74. The distinctions " 'have always involved considerations of degree.' " *Bartall*, 98 Ill. 2d at 306 (quoting *People v. Davis*, 35 Ill. 2d 55, 60 (1966)). It is the province of the trier of fact to assess whether the defendant's acts amounted to first degree murder or involuntary manslaughter. *Bartall*, 98 Ill. 2d at 307. We review a challenge to the sufficiency of the evidence to determine whether a rational trier of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 27 In challenging the sufficiency of the evidence, the defendant argues that the evidence cannot sustain a conviction for first degree murder. He submits that the facts do not establish he knew his actions were practically certain to cause Greg's death and or that he was aware the gun was loaded. The interview recordings show that the defendant could not recall the details of the shooting and that he merely agreed with the version of events offered by Webb and Blackwell, using such phrases as "I reckon so," "the best [he] remembered," and "cannot say for sure." He based his narrative of the events on what had happened on two or three prior occasions when Greg had grabbed his shotgun, put the barrel in his mouth, and told the defendant to pull the trigger. In those incidents, Greg would direct the defendant to "squeeze the trigger" or "pull the trigger." Neither Greg nor the defendant expressed an intent to kill. Greg's words were not "shoot me" or "kill me." In fact, the defendant adamantly denied that he instigated the use of the gun. The defendant was definitive that he did not retrieve the gun and approach Greg with it. Both the defendant and Mabis said that Greg always grabbed the gun; the defendant never did.

11

¶ 28    From what the defendant could surmise, on the morning of the shooting, Greg, as he had before, retrieved the gun, placed the barrel near his mouth, and taunted the defendant to pull the trigger. The defendant denied that he intentionally shot Greg and said it "definitely was not [him] getting the gun, [saying] I'm going to kill you." According to the defendant, he would not personally retrieve a gun "and say, look dude, I'm going to blow your head apart." He adamantly denied that he instigated the gunplay. He did not know if the gun was loaded but he did not think Greg would leave a gun loaded because it was not safe. He did not load the gun, emphasizing that he "did not chamber no shell." He denied that he held the gun but admitted he may have supported it. The defendant acknowledged that pulling a trigger would harm a person if the gun was loaded.

¶ 29    As stated above, the difference between first degree murder and involuntary manslaughter is a matter of degree with intent being the distinguishing factor. The determination is fact specific. *People v. Collins*, 213 Ill. App. 3d 818, 826 (1991). Nevertheless, we find guidance in other cases which reduced a conviction based on lack of evidence of intent. In *Collins*, the defendant and victim were roommates who were involved in a drunken argument where they "tussled," the defendant's gun went off, and the victim was killed. *Id.* at 823. The appellate court reduced the defendant's conviction for first degree murder to voluntary manslaughter, finding that the State failed to prove the necessary intent. *Id.* at 825-26. As in the case at bar, the State's evidence regarding the defendant's mental state was "too inconclusive, vague, and contradictory" to sustain a first degree murder conviction. *Id.* at 826-27. In *People v. Ellis*, 107 Ill. App. 3d 603, 609 (1982), the defendant shot the victim while they were wrestling after the defendant asked the victim to leave the apartment. The defendant was aware the gun was loaded as he fired a warning shot. *Id.* The defendant maintained that the gun discharged the second time accidently when the victim lunged at him, and he did not intend to shoot the victim. *Id.* The reviewing court found the evidence

12

insufficient to sustain a first degree murder conviction where the defendant's version of events was not improbable or impeached by the State. *Id.* at 610-11.

¶ 30    As in *Collins* and *Ellis*, the State failed to prove the defendant's intent sufficient to sustain a first degree murder conviction. We find that the State's evidence cannot sustain a conviction for first degree murder. The interviews demonstrate that, for the most part, the defendant could not recall the events that resulted in Greg's death. He presented a version of events based on similar incidents that had happened with Greg. The defendant consistently recounted that on other occasions, Greg would retrieve the gun and taunt him with it. He did not express or display anger toward Greg or suggest there had been any aggression on his part. He adamantly denied that he would take such action. Both Webb and Blackwell found the defendant to be credible in the interviews. Moreover, his recollection was corroborated by Mabis, who recalled seeing Greg retrieve the gun on a prior occasion and testified that she had not seen the defendant with a gun. She also said that before she left the house, she heard Greg ask the defendant whether he had to retrieve a gun in order to convince the defendant to leave. There is no evidence that the defendant knew the shotgun was loaded. The defendant speculated that Greg would not leave a loaded shotgun around the house. He did not load the gun himself or recall hearing Greg load it. The defendant acknowledged death would likely occur if the gun was loaded but he did not know whether the gun was loaded when he pulled the trigger or on the occasions when he did not. His fingerprints were not found on the trigger of the gun or on the spent shell.

¶ 31    The evidence did not establish that the defendant knew his acts would "create a strong probability" of death or great bodily harm to Greg. Rather, the evidence showed that the defendant recklessly disregarded that this conduct was likely to lead to Greg's death. Although his acts, as surmised, were likely to cause death or great bodily harm to Greg, the defendant committed them

13

recklessly. He "consciously disregarded a substantial and unjustifiable risk" that harm or death would result, and that disregard deviated from a reasonable person's standard of care in the same circumstances. We conclude that the evidence establishes that the defendant pulled the trigger in conscious disregard of the risk that Greg's death would result. That conduct constitutes involuntary manslaughter. We thus reduce his conviction for first degree murder to involuntary manslaughter. See Ill. S. Ct. R. 615(b)(3) (eff. Jan. 1, 1967). We remand for sentencing on involuntary manslaughter.

¶ 32                                III. CONCLUSION

¶ 33        For the foregoing reasons, the judgment of the circuit court of Fulton County is affirmed as reduced to involuntary manslaughter and the cause remanded for resentencing.

¶ 34        Affirmed as modified and remanded.

¶ 35        JUSTICE SCHMIDT, dissenting:

¶ 36        After defendant pulled the trigger of a shotgun pointed at his brother's head, the majority finds that "[t]he evidence did not establish that the defendant knew his acts would 'create a strong probability' of death or great bodily harm." *Supra* ¶ 31. For reasons that should be obvious, I dissent.

¶ 37        We presume a defendant intends the natural and probable consequences of his actions. *People v. Foster*, 168 Ill. 2d 465, 484 (1995), *as modified on denial of reh'g* (1996). A voluntary and willful act having the natural and probable consequences of causing death or great bodily harm is evidence of an intentional act rather than recklessness. *People v. Kibayasi*, 2013 IL App (1st) 112291, ¶ 42. Great deference is afforded to the trier of fact as it is their province to assess whether the acts complained of satisfied the intent for first degree murder. *Bartall*, 98 Ill. 2d at 307; *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). We review the evidence in the light most favorable

14

to the State, drawing all reasonable inferences in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005).

¶ 38 In coming to the conclusion that pulling the trigger of a shotgun aimed at someone's head fails to establish knowledge that the act creates a strong probability of death or great bodily harm, my colleagues discuss *People v. Collins* and *People v. Ellis*. *Supra* ¶ 29. Assuming, for the sake of argument, that *Collins* and *Ellis* were correctly decided, they are distinguishable from the case before us, as there was no struggle for the shotgun. Further, *Ellis* focused on the defendant's claim of self-defense.

¶ 39 The majority also emphasizes that during interrogation, defendant could not recall murdering his brother. Instead, he generalized, relying on facts from previous similar incidents. From this, the majority finds that "Neither Greg nor the defendant expressed an intent to kill. Greg's words were not 'shoot me' or 'kill me.' " *Supra* ¶ 27. The evidence undercuts these assertions.

¶ 40 As pointed out above, Sheriff Standard approached defendant asking him what happened to his brother. Defendant responded, "He asked me to shoot him ***[.]" Mabis testified that on a previous occasion with a shotgun pointed at his head, Greg told defendant, "If I am such a burden to you brother, then put me out of your misery." How do you shoot someone with an empty gun? Common sense requires that a gun is loaded in order to shoot someone or put them out of a sense of misery.

¶ 41 Contrary to the assertions by the majority, the evidence here is neither inconclusive, vague, nor contradictory. The jury heard, among other things, that defendant could only take so much of Greg's preaching; he assumed the shotgun was loaded; he could not remember but "must have" heard Greg load the shotgun; he could not remember Greg saying he wanted to die but he had said

15

it before; he was certain he must have known that by pulling the trigger he would end Greg's life; and he reckoned he was angry enough to pull the trigger. When you willfully and knowingly engage in an act, you must be prepared for the consequences that are likely to follow. Or as defendant stated on the way to jail, "people get what they deserve." Using the appropriate standard of review, a reasonable trier of fact could find defendant guilty of first degree murder beyond a reasonable doubt.

¶ 42    The other issues raised by defendant are without merit. We should affirm.